**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN  DIVISION**

| | | |
|---|---|---|
| **DONALD STEELE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.:  2:05-CV-2475-RDP** |
| | ) | |
| | ) | |
| **MERCEDES-BENZ U.S.** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

**I.      INTRODUCTION**

This case is before the court on Mercedes-Benz U.S. International, Inc.'s ("MBUSI" or "Defendant") Motion for Summary Judgment (Doc. # 16) filed January 16, 2007.  This motion has been fully briefed by the parties and is now under submission.  After careful review of the record and the arguments made by the parties, the court finds this motion is due to be granted in part and denied in part.  For reasons set forth more fully below, the court concludes that the existence of a material factual dispute precludes the entry of summary judgment for MBUSI on all claims at this time, and this case is due to be set for pretrial and trial accordingly.

**II.     THE PARTIES' CLAIMS**

Plaintiff Donald Steele alleges that MBUSI, his former employer, terminated his employment in violation of the Family and Medical Leave Act ("FMLA").  MBUSI has denied Plaintiff's claim and filed counterclaims seeking reimbursement for a $1,650.00 expense advance, $10.00 bad check

processing fee, and $5,233.87 in lease payments and milage fees it paid on Plaintiff's M-Class vehicle.

## III.   STATEMENT OF UNDISPUTED FACTS

### A.   MBUSI's Family and Medical Leave Policy.

MBUSI operates an automobile assembly facility in Vance, Alabama.  (Doc. # 18 Ex. 1). MBUSI has adopted and broadly disseminated a Family and Medical Leave ("FML") policy, and that policy is included in its Team Member Handbook.  (Doc. # 18 Exs. 1 & 2 pp. 51–52).  MBUSI's Medical Department administers its FML policy.   (Doc. # 18 Ex. 3 p. 10; Doc.  # 18 Ex. 4 pp. 32–33).  Carol Davis ("Davis") is the Medical Specialist in MBUSI's Medical Department.  (Doc. # 18 Ex. 3 p. 9).  Under MBUSI's FML Policy, when a team member requests family and medical leave, he is provided a packet of materials by the Medical Department.  (Doc. # 18 Ex. 3 pp. 27–28; Doc. # 18 Ex. 5 pp. 88–89).   The packet of materials includes the necessary paperwork that must be completed by the team member and his physician in order to receive short term disability ("STD") and/or FML.  (Doc. # 18 Ex. 3 pp. 73–74; Doc. # 18 Ex. 6).   STD is a company sponsored program that provides paid leave under certain conditions.  (Doc. # 18 Ex. 6).  The MBUSI team member is responsible for submitting the appropriate STD and FML paperwork to MBUSI's Medical Department.  (Doc. # 18 Ex. 3 p. 31; Doc. # 18 Ex. 4 pp. 38–39).  The MBUSI Medical Department then evaluates the paperwork to determine whether the requested leave will be approved, denied, or if further information is needed.  (Doc. # 18 Ex. 2 p. 3 ¶ B1; Doc. # 18 Ex. 3 p. 37; Doc. # 18 Ex. 4 p. 33).  MBUSI also provides its team members emergency vacation days, which the team member may utilize for certain absences.  (Doc. # 18 Ex. 1 p. 34; Doc # 18 Ex. 5 p. 46).

### B.    MBUSI's Attendance Policy.

MBUSI also has adopted and broadly disseminated its Attendance Policy, and describes that policy in the Team Member Handbook.  (Doc. # 18 Ex. 7; Doc. # 18 Ex. 1 pp. 29–32).   Pursuant to MBUSI's Attendance Policy, if a team member will be absent from work, the team member is required to call in and report this in advance of his shift.  (Doc. # 18 Ex. 1 pp. 29–30; Doc. # 18 Ex. 7 p. 2).   Pursuant to the Attendance Policy, a team member who is absent from work for three consecutive days without notification and/or approval is considered to have resigned without notice.  (Doc. # 18 Ex. 1 p. 31; Doc. # 18 Ex. 7).  If a team member applies for STD or FML, he is required to appear at work or call in advance of his shift until he has been approved for such leave.  (Doc. # 18 Ex. 3 pp. 29, 35; Doc. # 18 Ex. 7 pp. 2–3; Doc. # 18 Ex. 8 pp. 19–20).   The Medical Department is required to remind the team member of his continuing obligation to seek approval when it provides the team member his STD and FML packet of materials.  (Doc. # 18. Ex. 3 pp. 5, 29, 35).  Plaintiff was aware he was required to call in at least two hours before his shift if he was to be absent. (Doc. # 18 Ex. 5 pp.100,101).

### C.    Plaintiff's Initial Employment.

On August 18, 2003, Plaintiff began a six month training period with Hestair, a staffing company that provides workers to MBUSI.  (Doc. # 18 Ex. 5 p. 31; Doc. # 18 Ex. 9).  Plaintiff began his employment as a team member with MBUSI on February 16, 2004.  (Doc. # 18 Ex. 10).  Plaintiff received a Team Member Handbook which, as noted previously, included information regarding the FML Policy and the Attendance Policy.  (Doc. # 18 Ex. 5 p. 36; Doc. # 18 Ex. 11).

**D.**     **Plaintiff's Previous Leaves.**

From June 1, 2004 through July 12, 2004, MBUSI provided Plaintiff a leave of absence due to a vitreous hemorrhage in his left eye, even though he was ineligible for FML at the time.  (Doc. # 18 Ex. 3 p. 11; Doc. # 18 Ex. 12).  Plaintiff requested, and was provided, FML by MBUSI for a retinal bleed for November 11, 12, and 19 (4 hours), 2004.  (Doc. # 18 Ex. 3 pp. 11–13; Doc. # 18 Ex. 5 pp. 113–14; Doc. # 18 Ex. 13).

**E.**     **Plaintiff's Discipline While Employed at MBUSI.**

On February 27, 2004, Plaintiff was verbally counseled by MBUSI because he called a female team member "Butch" in regard to her hairstyle.  (Doc. # 18 Ex. 5 p. 41; Doc. # 18 Ex. 15).  On December 8, 2004, Plaintiff received a Level One corrective performance review from MBUSI because he violated the Attendance Policy.  (Doc. # 18 Ex. 14 pp. 48–49; Doc. # 18 Ex. 16).  On March 17, 2005, Plaintiff received a Level Two corrective performance review from MBUSI because he threatened physical abuse towards another team member while on a business trip to Germany.[1] (Doc. # 18 Ex. 5 p. 49; Doc. # 18 Ex. 17).

**F.**     **MBUSI's The Medical Department.**

When Plaintiff needed leave for medical reasons, he worked with Carol Davis in the Medical Department.  (Doc. # 18 Ex. 5 pp. 23–24).  Plaintiff acknowledges that Davis was always very helpful to him.  (*Id.* at 24).  Plaintiff had no prior disagreements or disputes with anyone in the MBUSI Medical Department.  (*Id.* at 23).  Additionally, no one at MBUSI ever made any negative or adverse comments to Plaintiff regarding family and medical leave.  (*Id.* at 24).

---

[1]On September 8, 2003, during his training period with Hestair, Plaintiff received a final warning due to attendance issues.  (Doc. # 18 Ex. 14).

G.    **Plaintiff's Medical Condition.**

Plaintiff contends that he suffers from two medical conditions, diabetes and high blood pressure. (*Id.* at 58–59). Plaintiff testified he suffered bleeding in the eye as a result of his diabetes. (*Id.* at 60).

H.    **The May 2005 Events.**

On May 4, 2005, Plaintiff approached his Group Leader, Curtis Gibbs ("Gibbs"), stated that he had a problem with his eye, and requested permission to leave. (Doc. # 18 Ex. 5 pp. 21, 75; Doc. # 18 Ex. 8 pp. 9–10, 14–15; Doc. # 18 Ex. 18).   At that time, Plaintiff had exhausted all of his vacation days and emergency vacation days. (Doc. # 18 Ex. 8 pp. 15, 17). Gibbs called a Human Resources representative to discuss options available to Plaintiff. (*Id.*).

After completing his shift, Plaintiff went to visit his physician, Dr. Kimble. (Doc. # 18 Ex. 5 p. 76; Doc. # 18 Ex. 8 p. 20; Doc. # 18 Ex. 18 p. 2). Dr. Kimble provided Plaintiff a work restriction form relieving him from work until May 11, 2005. Plaintiff promptly provided the form to MBUSI's Medical Department on that same day, May 4, 2005. (Doc. # 18 Ex. 5 pp. 72–73, 76; Doc. # 18 Ex. 19). The work restriction form was not signed by Dr. Kimble. (Doc. # 18 Ex. 5 p. 73; Doc. # 18 Ex. 19).

Plaintiff called in to report that he would be absent from work prior to his morning shift which began on Thursday May 5, 2005. (Doc. # 18 Ex. 8 p. 18; Doc. # 18 Ex. 18 p. 2). During that call-in, Plaintiff left a message stating he had trouble with his eye, would be absent for a week, and would bring a doctor's excuse to the Medical Department. (Doc. # 18 Ex. 8 pp. 19, 21–22; Doc. # 18 Ex. 18 p. 2). Plaintiff was scheduled to work the day shift, Monday to Friday at the time. (Doc. # 18 Ex. 5 p. 101; Doc. # 18 Ex. 8 pp. 22–23). Plaintiff called in, reported his absences, and did not

report for work for his shifts on Friday, May 6 and Monday, May 9, 2005. (Doc. # 18 Ex. 18 p. 2). Plaintiff did not report to work for his Tuesday, May 10, 2005 shift, and again called in and reported off from work prior to that shift. (Doc. # 18 Ex. 18 p. 2; Doc. # 18 Ex. 8 p. 18).

Plaintiff returned to Dr. Kimble's office on May 10, 2005 and received a work restriction form which prohibited him from driving until May 17, 2005. (Doc. # 18 Ex 5 pp. 79–80; Doc. # 18 Ex. 20). Plaintiff believes Dr. Kimble's office faxed the work restrictions form to MBUSI. (Doc. # 18 Ex. 5 p. 82). Plaintiff left a message on the morning of May 11, 2005 that he would not be at work for that shift and would not return to work until May 18, 2005. (Doc. # 18 Ex. 8 pp. 25–26; Doc. # 18 Ex. 18 p. 2). Therefore, it is Plaintiff's position that he gave notice of his absences from May 4, 2005 through May 18, 2005. Gibbs did not call Plaintiff back to clarify the period of Plaintiff's absence because according to him, "It's not my responsibility." (Doc. # 18 Ex. 8 pp. 25–26). Plaintiff did not report to work for his Thursday, May 12, 2005 shift. (Doc. # 18 Ex. 18 p. 2).

On May 11, 2005, MBUSI Team Relations Representative, Randy Olive ("Olive"), called Plaintiff and informed him that he needed to turn in his short term disability papers. Plaintiff testified that the Medical Department also called him and told him to get his short term disability papers completed. (*Id.* at 76–77). Plaintiff alleges that Olive did not inform him that his absences were not covered under FML or STD. (Doc. # 18 Ex. 5 pp. 86–87; Doc # 18 Ex. 22). Plaintiff's son drove him to the MBUSI plant so he could get the STD forms. (Doc. # 18 Ex. 5 pp. 78–79). Plaintiff testified that he filled out the required parts of the FML and STD forms and then took the papers to Dr. Kimble's office for him to complete. (*Id.* at 89–94). MBUSI's medical log sheet

reflects that on May 12, 2005, the Medical Department also faxed a packet of leave papers to Dr. Kimble.  (Doc. # 18 Ex. 23).

Plaintiff did not report to work on Friday, May 13, 2005 or Monday, May 16, 2005.  (Doc. # 18 Ex. 5 p. 104).  Plaintiff's group leader, Gibbs, notified team relations that Plaintiff was absent. (Doc. # 18 Ex. 4 pp. 14–17).  On May 16, 2005, the Medical Department again faxed the STD papers to Dr. Kimble's office.  (Doc. # 18 Ex. 3 pp. 45–46, 49–50; Doc. # 18 Ex. 24).  Plaintiff testified that he did not turn in any leave paperwork, but relied on the doctor's office do that.  (Doc. # 18 Ex. 5 pp. 104–05).

## I.    The Call-Ins.

Plaintiff initially testified that he called in on May 10, 12, 13 and 16, but then admitted that he was not positive that he called in every day.  (*Id.* at  99).  Plaintiff admits that such calls would be long distance telephone calls.  (*Id.* at  96).  Some of the  numbers that Plaintiff would have called from in order to report off of work are 205-657-5107, 205-462-6478 and 205-371-4220.  (Doc. # 18 Ex. 5 pp. 99, 119; Doc. # 18 Ex. 26).  Plaintiff's telephone service is provided by BellSouth (205-681-5705) and BellSouth's telephone records reflect that Plaintiff did call in on May 10, 2005 but did not call on May 12, 13, or 16.  (Doc. # 18 Ex. 5 pp. 96–97; Doc. # 18 Ex. 27; Doc. # 18 Ex. 28). Plaintiff testified that he may have used his son's Verizon cellular telephone (205-790-4490) to call into MBUSI.  (Doc. # 18 Ex. 5 pp. 97–98).  Verizon's telephone records reflect that Plaintiff did not use his son's cellular telephone to call in on any of the noted days.  (Doc. # 18 Ex. 27; Doc. # 18 Ex. 29).  Plaintiff testified that the only other telephone he may have used would have been his wife's Nextel cellular telephone (205-965-3235).  (Doc. # 18 Ex. 5 pp. 98–99).  Nextel's telephone records

reflect that Plaintiff did not use his wife's cellular telephone to call in on any of the noted days. (Doc. # 18 Ex. 27; Doc. # 18 Ex. 30).

J.    **The Termination Decision.**

On or about May 2005, Paul Grimes ("Grimes"), Assistant Manager in MBUSI Team Relations, made an administrative decision to recommend termination of Plaintiff's employment because Plaintiff had been absent from work without calling in on May 10, 12, 13 and 16, the last three days of which were consecutive.  Plaintiff's employment was terminated on May 17, 2005. (Doc. # 18 Ex. 4 pp. 9–10, 12–14, 58–59; Doc. # 18 Ex. 31).  On May 16, 2005, Grimes had a meeting with Gibbs and Olive, and also spoke with Carol Davis from the Medical Department.  (*Id.* at 13, 16–17).  Gibbs and Olive informed Grimes that Plaintiff had been absent from work for three consecutive days without calling in to MBUSI.  (Doc. # 18 Ex. 4 pp. 16–17).

Under MBUSI's Attendance Policy, the failure to call in or report to work for three consecutive days is viewed as a voluntary termination.  (Doc. # 18 Ex. 1 p. 31; Doc. # 18 Ex. 7 p. 1).  Plaintiff claims he was terminated in violation of FMLA, and, additionally, that Gibbs did not like him and that dislike played a part in his termination.  (Doc. # 18 Ex. 5 pp. 101–103, 118). Plaintiff never had any discussions with Gibbs regarding the FMLA or taking FML.  (Doc. # 18 Ex. 5 p. 103; Doc. # 18 Ex. 8 p. 13).  It is undisputed that MBUSI had previously never denied an FML request for Plaintiff.  (Doc. # 18 Ex. 5 p. 114).

Prior to making the decision to terminate Plaintiff, Grimes wanted to make sure there were no hidden variables since he was dealing with a "long term employee situation."  (Doc. # 18 Ex. 4 p. 17).  Prior to taking any action regarding Plaintiff's employment, Grimes told Gibbs to check the phone logs to ensure that Plaintiff had not called in.  (*Id.* at 18).  Even though Gibbs knew that

8

Plaintiff had called in on May 11, 2005, and said he would be out under doctor's care until May 18, 2005 (Doc. # 18 Ex. 8 pp. 25-26), he failed to inform Grimes of that fact. (Doc. # 18 Ex. 4 p. 18). Grimes testified that if Plaintiff had (1) called Gibbs and informed him that Plaintiff would be out for a week due to a medical condition, and (2) brought in the documentation that Plaintiff had indeed gone to the doctor that day (May 10, 2005), then Plaintiff would have been given the opportunity to finish the FML process.[2] (*Id.* at 18–19).

Plaintiff faxed a signed medical excuse to MBUSI's Medical Department on May 11, 2005. (Doc. # 20 Ex. 1 pp. 1–2). During the meeting on May 16, 2005, which included Gibbs, Olive, and Davis, Grimes testified that he was not presented with any medical information whatsoever. (Doc. # 18 Ex. 4 p. 27). Davis's recollection of the meeting is different. She testified that it was her normal policy to inform Grimes that she had sent a Plaintiff FML paperwork. (Doc. # 18 Ex. 3 pp. 25–26). She further testified that she showed Grimes Plaintiff's doctor excuse, and informed Grimes what the current status was with the FML paperwork. (Doc. # 18 Ex. 4 p. 26). However, Grimes testified that he was sure that the Medical Department would have notified him if Plaintiff had provided documentation that would have cleared him for the absences, but he insists he did not receive any such documentation. (*Id.* at 32). Grimes testified that it is acceptable for an employee to call in and say that they will be absent from work for more than one day at a time, provided they

---

[2]According to Grimes, Plaintiff was required to provide the doctor's excuse information to his supervisor and then to the Medical Department for verification. (*Id.* at 20). Grimes testified that if Plaintiff had provided proper medical documentation that he needed to be absent for that time period, his position regarding Plaintiff's termination would have changed, and he would not have terminated Plaintiff. (*Id.* at 23–25).

submit medical documentation.  (*Id.* at 34–35).  Grimes admits that if Plaintiff had provided accurate

documentation that met the usual standard, he would not have been terminated.  (*Id.* at 46).

### K.   Plaintiff's Car Lease.

MBUSI has a car lease program policy ("Lease Policy"), which enables its team members

to lease M-class vehicles during their employment at MBUSI.   Plaintiff leased a vehicle pursuant

to that Policy.  (Doc. # 18 Ex. 5 pp. 105–107; Doc. # 18 Ex. 32).   MBUSI guaranteed payment of

Plaintiff's lease to Mercedes-Benz Credit Company ("MBCC").  (Doc. # 18 Ex. 33 p. 2; Doc. # 18

Ex. 34).  Under the lease agreement, Plaintiff was obligated to pay $515.79 per month for thirteen

months to lease the vehicle, for a total of $6,705.27.  (Doc. # 18 Ex. 33 p. 1).  The lease included a

mileage allowance during the term of the lease and provided that Plaintiff would be responsible for

mileage charges in excess of the mileage allowance and taxes.  (*Id.* at 2).  The lease also provided

that, upon its expiration, Plaintiff must either purchase the vehicle or return the vehicle and pay any

amounts due under the lease.  (*Id.* at 5).  MBUSI's lease policy requires a team member to return

their vehicle to MBUSI immediately if their employment is terminated during the lease period.

(Doc. # 18 Ex. 32 p. 3).  The Lease Policy also provides that the team member is liable for any

charges incurred in accordance with the lease.  (*Id.*).  The Lease Policy further provides that mileage

in excess of the mileage allowance is charged in accordance with the terms of the lease agreement

and that the leasing team member is responsible for all charges resulting from excess mileage.  (*Id.*

at 2, 6).

Plaintiff did not return the car upon termination of his employment and did not make

payments on his lease after his termination.  (Doc. # 18 Ex. 5 pp. 107,109).  On June 30, 2005,

MBUSI sent Plaintiff a letter reminding him that his lease would expire on September 6, 2005 and

asking him to contact MBUSI regarding his intent to return the car.  (Doc. # 18 Ex. 34 p. 9; Doc. # 18 Ex. 35).  Although Plaintiff denies receiving the June 30th letter, he knew when his lease expired, and he knew that he was required to return the car upon expiration of the lease.  (Doc. # 18 Ex. 5 pp. 107,108).  Plaintiff did not return his car upon expiration of the lease but continued to drive it.  (*Id.* at 107,109).  Plaintiff did return his car on December 16, 2005, after he filed this lawsuit.  (Doc. # 18 Ex. 34 pp. 6–7).  The car was over the allocated mileage for the lease.  (*Id.*)  As guarantor, MBUSI paid MBCC the lease payments, taxes, subsidy amount, and excess mileage charges that Plaintiff had failed to pay, totaling $5,233.87.  (*Id.* at 8).

### L.   Cash Advance.

In March 2005, MBUSI provided Plaintiff with a cash advance of $1,650.00 for expenses that they anticipated would be incurred by Plaintiff in the line of work.  (Doc. # 18 Ex. 5 pp. 109–10).  Plaintiff never incurred any of the anticipated expenses.  (*Id.*)  Plaintiff issued MBUSI a check dated March 30, 2005, in the amount of $1,650.00 for repayment of the cash advance.  (Doc. # 18 Ex. 5 p. 109; Doc. # 18 Ex. 36).  MBUSI attempted to deposit the check, but the bank returned the check due to insufficient funds and charged MBUSI a $10.00 processing fee.  (Doc. # 18 Ex. 5 p. 111; Doc. # 18 Ex. 37).  Despite repeated demands, Plaintiff has failed to repay MBUSI the $1,650.00 and the $10.00 processing fee.  (Doc. # 18 Ex. 5 p.111; Doc. # 18 Ex. 37).

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56 (c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking

for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. *See Fitzpatrick*, F.3d at 1115–17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; *i.e.*, facts that would entitle it to a directed verdict if not controverted at trial. *See Fitzpatrick*, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

12

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question. This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires that the movant point out to the district court that there is an absence of evidence to support the non-moving party's case. *See Fitzpatrick*, 2 F.3d at 1115–16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

## IV.    ANALYSIS

In order to decide MBUSI's motion, the court must resolve three issues: (1) how MBUSI's attendance and call-in policies were applied to Plaintiff; (2) whether Grimes had sufficient notice of Plaintiff's medical condition and attempt to apply for FML such that Plaintiff should have been

given the opportunity to complete his leave paperwork in order to qualify for leave under the policies; and, (3) whether Defendant is entitled to summary judgment on its counterclaim (and more specifically, whether Plaintiff's signature on the lease is necessary to enforce the car lease between Plaintiff and MBCC, even though Plaintiff has admitted in his deposition to being aware of the rules and procedures of the lease).

### A.   Plaintiff Has Presented Sufficient Evidence to Create a Genuine Issue of a Material Fact and Avoid Summary Judgment on His FMLA Claims.

The FMLA grants eligible employees the right to take twelve work weeks of leave during any "12-month period. . . because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612 (a)(1). To be an eligible employee, the employee must have worked for more than a year and have logged at least 1,250 hours during that past year. 29 U.S.C. § 2611(2)(A). It is undisputed that Plaintiff meets these latter two requirements.

Taking the facts in the light most favorable to Plaintiff, Plaintiff has presented sufficient evidence to show that he suffered from a serious health condition which prevented him from performing his job. A "serious health condition" is defined under the FMLA as "an illness, injury, impairment, or physical or mental condition that invokes (a) inpatient care in a hospital, hospice, or residential medical care facility; or (b) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). "Continuing treatment may involve treatment under the supervision of the health care provider." *Id.* A regime of continuing treatment includes, for example, a course of prescription medication. *Id.*

Plaintiff's doctor faxed a work restriction form to the Medical Department which provided that:  (1) Plaintiff was not to drive; (2) Plaintiff was visually-impaired from performing his job on a temporary basis; and (3) Plaintiff was to report back to the doctor for another visit on May 17, 2005.  This form was received by the Medical Department on May 11, 2005.  (Doc. # 18 Ex. 20).  Plaintiff's ability to see is vital to his position, in which he is required to locate and place pins on a car being manufactured before it moves to the robot for further processing.  (Doc. # 18 Ex.5 p. 63).  Also, that Plaintiff was due to report back to Dr. Kimble could reasonably be interpreted as continuing treatment.  Indeed, Plaintiff received FML leave in 2004 for the same injury.  (Doc. # 18 Ex. 3 pp. 11–12; Doc. # 18 Ex. 5 pp. 113–14).   It was reasonable for Plaintiff to believe this injury would be covered by FML.[3]

The next question is whether MBUSI interfered with Plaintiff's FMLA rights by not allowing him fifteen days to provide certification pursuant to its own FML policy.  An interference claim is one in which the "employee asserts that his employer denied or otherwise interfered with his substantive rights under the FMLA." *Stickland v. Water Works & Sewer Bd. of the City of Birmingham*, 239 F. 3d 1199, 1206 (11th Cir. 2001).  In order to state a claim that his employer has interfered with a substantive FMLA right, a plaintiff must demonstrate that he was entitled to the benefit but that it was denied.  *Id.* at 1206–07.  Plaintiff does not have to show that his employer intended to deny the right; the employer's motives are irrelevant.  *Id.* at 1208.

Plaintiff was terminated before the fifteen days provided for in MBUSI's own FML policy (*i.e.*, the amount of time MBUSI employees have to complete an FML application) had lapsed and

---

[3]It is also noteworthy that MBUSI never made a determination on whether Plaintiff's health condition was covered by FML.

also before a determination was made as to Plaintiff's status under FML. (Doc. # 18 Ex. 4 pp. 9–10, 12–14, 58–59). The Medical Department was still inquiring into whether Plaintiff qualified for leave under the FMLA when his file was closed due to his absences. Had Plaintiff been granted leave under the FMLA, it is undisputed that his absences would have been excused.[4] (*Id.* at 23–25). The conflicting testimony pertaining to whether Grimes was actually informed of Plaintiff's medical condition, when taken in conjunction with the fact that Gibbs had knowledge of Plaintiff's medical excuse and failed to tell Grimes of such information,[5] creates a  genuine issue of material fact on Plaintiff's interference claim.  Thus, MBUSI has not met its burden on summary judgment of demonstrating the absence of any material factual dispute and its entitlement to judgment as a matter of law, and this part of Defendant's motion for summary judgment will be denied.

Lastly, Plaintiff has demonstrated that there is a genuine issue of material fact that precludes summary judgment for Defendant on Plaintiff's retaliation claim.  In order to establish such a claim, Plaintiff must show that (1) he availed himself of a protected right under the FMLA; (2) he suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision. *See Wascura v. City of S. Miami*, 257 F. 3d 1238, 1248 (11th Cir. 2001).

---

[4]Plaintiff's case is similar to that of *Cooper v. Fulton County, Ga.*, 458 F.3d 1282 (11th Cir. 2006) in which the plaintiff was fired for not presenting the proper paper work for FMLA leave within the six days his employer allowed.  Although in the present case Plaintiff was fired for absences, these absences would have been excused had he been allotted the proper time period to collect and present MBUSI's required forms for FMLA leave.

[5]Again, Grimes testified that if Plaintiff had (1) called Gibbs and informed him that Plaintiff would be out for a week due to a medical condition, and (2) brought in the documentation that Plaintiff had indeed gone to the doctor that day (May 10, 2005), then Plaintiff would have been given the opportunity to finish the FML process.  (*Id.* at 18–19).

Applying these elements here, the court concludes Plaintiff has offered substantial evidence that suggests that he has engaged in conduct pursuant to MBUSI's policy regarding FML leave when he contacted the Medical Department, requested the necessary paperwork, and informed the Medical Department that he would be requesting FML. The doctor's note he provided the Medical Department (which stated his medical condition and need to miss work until May 18, 2005) demonstrates that he attempted to take FML leave, which is undisputably "a right under the FMLA." Plaintiff was terminated and thus suffered an adverse employment decision. Finally, the causal connection needed for the third prong can be inferred from the fact that Gibbs did not tell Grimes that Plaintiff called in on May 11, 2005, nor did he relate that Plaintiff stated he would be out until May 18, 2005. Even though Gibbs knew of Plaintiff's seven-day medical excuse, he did not provide this essential information to Grimes. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1304 (11th Cir. 1999); *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331 (11th Cir. 1999). Additionally, a reasonable fact-finder could infer from Davis's testimony (which conflicts with that of Grimes) that Grimes was actually provided with Plaintiff's pending FML status and doctor's excuses from the Medical Department, and that he chose to terminate Plaintiff anyway, in violation of the FMLA and Defendant's own FML policy. For these reasons, MBUSI has not met its summary judgment burden of demonstrating the absence of any material factual dispute regarding Plaintiff's FMLA claims, and, thus, is not entitled to judgment as a matter of law on those claims.

### C.    Defendant's Counterclaim.

MBUSI has also moved for summary judgment on its counterclaims. Under Alabama law, a party must establish four elements to prove a breach of contract claim: (1) a valid contract that is binding on the parties; (2) Defendant's performance under the contract; (3) Plaintiff's

nonperformance; and, (4) Defendant's resulting damages. *State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 303 (Ala. 1999). The court finds that all of these elements are established by the undisputed evidence in this case and that Defendant is entitled to summary judgment on its breach of contract claim.

First, there is no real question that MBUSI can show it was a party to a valid contract with Plaintiff. It was a surety or guarantor of an agreement between Plaintiff and MBCC. When a surety or guarantor makes payments for a non-performing party under a contract, the surety is then entitled to collect the sum paid. ALA. CODE § 8-3-5; see *Jones v. Moore*, 102 So. 200 (Ala. 1924). Here, MBUSI acted as surety or guarantor for Plaintiff's lease agreement with MBCC, and the validity of the lease entered into between MBCC and Plaintiff is not disputed. (Doc. # 18 Ex. 5 pp. 105,106). Second, there is no question that MBUSI performed under the agreement. Plaintiff admits that MBCC leased him the car and MBUSI was his guarantor. (*Id*.). Finally, it is undisputed that Plaintiff breached the agreement and MBUSI was damaged by that breach. Under the lease agreement, MBUSI rightfully charged Plaintiff $515.79 for an additional month's use of the car (11/6/05–12/6/05); $1,884.75 for additional mileage charges; $272.81 as a subsidy amount for an extra month; $28.50 as tax for extra monthly mileage; and the original contract lease amount of $6,705.27. (Doc. # 18 Ex. 34 p. 3). It is undisputed that Plaintiff had the benefit of the leased car. (Doc. # 18 Ex. 5 pp. 105–108). It is also undisputed that he has yet to complete his payments on the lease. (*Id.*). Finally, the lease (that Plaintiff acknowledges signing in his sworn deposition) states he is liable for excess milage and other expenses. (*Id*) Plaintiff testified that he was aware of his obligation under the lease and he understood its terms. (Doc. # 18 Ex. 5 pp. 105–108). Plaintiff has paid $4,173.25 of this amount leaving an amount of $5,233.87 unpaid. (Doc. # 18 Ex. 34 p. 3).

MBUSI  guaranteed Plaintiff's payment of the lease to MBCC in the amount of $5,233.87, which

it has paid to MBCC.  Therefore, the court finds MBUSI is entitled to judgment as a matter of law

on its breach of contract claim concerning its lease agreement with Plaintiff.  (Doc. # 18 Ex. 33 p.

2; Doc. # 18 Ex. 34).

The undisputed evidence also shows that Plaintiff is liable to MBUSI for the $1,650.00 that

was paid to him in advance for expenses which Plaintiff never incurred and which he never repaid

MBUSI.  (Doc. # 18 Ex. 5 p. 109).  The expense advance is an open account and a stated account

which Plaintiff owes to MBUSI.  "A plaintiff establishes a prima facie case in an action for money

due on an open account by presenting evidence that money was delivered to [the plaintiff], that it

was a loan, and that it has not been repaid."  *See e.g., Livingston v. Tapscott*, 585 So. 2d 839, 841

(Ala. 1991).   MBUSI loaned Plaintiff $1,650.00 for anticipated business expenses, and Plaintiff

neither incurred the expense nor repaid the money to MBUSI.  (Doc. # 18 Ex. 5 pp. 109–10).

Plaintiff owes the money on this open account and admits to receiving this advance payment.  (*Id.*).

Plaintiff tendered a check for $1,650.00, the amount owed to MBUSI, ostensibly repaying the

advance on March 30, 2005.  (*Id.*).  When attempting to honor that check, the bank found that

Plaintiff had insufficient funds in his account to pay it.  (Doc. # 18 Ex. p. 111; Doc. # 18 Ex. 37).

Plaintiff does not deny liability for the amount and, therefore, Plaintiff owes MBUSI the money on

the account stated.  (Doc. # 18 Ex. 5 p. 110).  MBUSI is, therefore, entitled to collect from Plaintiff

the $1,650.00, plus the $10.00 bad check processing fee, for a total of $1,660.00 on its claims related

to the expenses advance made to Plaintiff.

Even if the undisputed facts of this case did not show that Plaintiff is liable for his breach of

contract with MBUSI, MBUSI is entitled to the recovery of payments it made under the lease and

19

the expense advance in order to avoid any unjust enrichment of Plaintiff.  "Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Tucker v. Scrushy*  2006 WL 37028, at *6 (Jefferson County, Ala. Cir. Ct. Jan. 3, 2006); *see also Azalea City Motels, Inc. v. First Ala. Bank of Mobile*, 551 So. 2d 967, 978 (Ala. 1989).  In order to obtain restitution, a plaintiff must show that the defendant was unjustly enriched, that he secured a benefit, and that it would be unconscionable to allow him to retain that benefit.  *Id.*

Finally, MBUSI is also entitled to recover the expense advance under § 7-3-414 of the Alabama Commercial Code.  This section of the Alabama Commercial Code provides a remedy against Plaintiff for his bad check.  It states that the drawer of the check is obligated to pay the amount of the check if it is dishonored.  It is undisputed that Plaintiff issued a check to MBUSI in the amount of $1,650.00 and that the bank dishonored said check upon MBUSI's attempt to deposit it.  Therefore, MBUSI is entitled to collect $1650.00 from Plaintiff plus the $10.00 bad check fee.

## V.   CONCLUSION

For the reasons set forth above, the court finds Defendant's Motion for Summary Judgment is due to be granted in part and denied in part.  Summary judgment for Defendant is due to be granted as to Defendant's contract claims because MBUSI has demonstrated that there are no disputed issues of material fact related to these claims.  However, there are disputed issues of material fact regarding Plaintiff's FMLA claims, which preclude judgment for Defendant as a matter of law.

**DONE** and **ORDERED** this <u>3rd</u> day of July, 2007.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE